We'll move on to the next case, Alkholi v. Macklowe. Good morning, your honors. May it please the court, my name is Kristen Niven with Ackerman on behalf of the appellants, Dr. Hamza B. Alkholi and Mr. Ahmed Helwani. We are challenging the district court's dismissal of all of the appellants' breach contract and quasi-contract claims. The fundamental agreement at the heart of this action is actually quite simple. The appellees, Macklowe Investment Properties, and Mr. Harry Macklowe were embarking on a venture to purchase and develop a commercial property at 432 Park Avenue. To do this, they needed to raise $450 million in capital. They engaged the appellants, who at the time were their intended co-investors, to procure additional investors to provide the necessary capital. The parties reached an agreement to pay the appellants a fee of 2% of the capital raised. This is the agreement we refer to as the capital raise agreement. Excuse me, but the parties reached an agreement to pay. They reached an agreement as to who would benefit from the services. That is the appellees in this situation. In fact, this is most clear in the fact that when it comes to, let's say, the quasi-contract claims, even assuming that the contract itself, putting that aside for a second, the jurisprudence in the New York Court of Appeals is clear that all that needs to be demonstrated was that there was an actual engagement of the services that were actually performed, and then the obligation of the party engaging the services and benefiting therefrom. Point us to where the defendants agreed that they would pay the 2% fee. Well, Your Honor, the district court actually did find that the agreement was reached by December 20th, 2013, and now the source of the funding and the structure of the funding was intended... Where's the agreement? I'm interested in what is the writing that says the defendants will pay the 2% fee. We maintain that that is in the November 6th, 2013 email in which Mr. Macklowe said a 2% fee will work, and he was representing the only other party to this transaction saying, we want to engage you to raise the capital, and we're going to pay you a 2% fee. That'll work for us. The email says, I think a 2% fee will work, and then there's follow-up email suggesting that this was a counteroffer. There is the phrase a counteroffer, but there's other phrases which indicate... Why would they be using the word counteroffer if there had been a meeting of the minds as to who would pay, a meeting of the minds that Macklowe would pay? Well, Your Honor, there were actually a couple of parallel agreements that were being negotiated, and the capital raise agreement was one element that had been set by November 6th, but the parties were continuing to negotiate the full terms of the joint venture, and that was referred to as the deal structure. There were other terms that they continued to negotiate, and it was understood that they needed to reach a formal agreement on the joint venture with respect to the party's in the property, but there was no precursor agreement that a formalized agreement needed to occur for any capital raise or finder's fee. So when they said there were counteroffers, there were other aspects to the deal with respect to the joint venture that the parties continued to negotiate after they had reached a fundamental agreement to pay a fee for the service of acquiring more capital and acquiring... But wasn't one of those changes that occurred changing in December to not having Macklowe pay, but having the joint venture pay, having the obligor be the venture itself? That is true. In December 2013, the parties were contemplating that the payment of the capital raise fee would be structured as a deal cost. Now, at the time, the appellants could agree to this themselves because they were also the fee by wrapping it into the deal cost. Now, this went away when they were excluded from the joint venture through no fault of their own, but that doesn't obviate the whole agreement that they were entitled to a fee for services they actually performed. Then it became the responsibility of the only other party, the obligor, to determine how they were going to meet their obligations. But that was not the fault of the appellants, and it also wasn't something that they didn't say, we only deserve a fee if we are partners in this agreement. There's no evidence that that was a condition of the appellee's performance under this agreement. How do you deal with the April 30th email from 2014 where plaintiffs say, we will have no further placement or brokerage fees related to the transaction? Well, your honor, I believe those communications were exclusively between the appellants and Q-Invest, or Hamad Al-Tani, who we refer to as HBJ, the Qatari shake. And the appellees were not party to these communications. So they were agreeing with Q-Invest, the investor that came in and ultimately excluded the appellees from the agreement, to find some compensation for their exclusion, as well as the fact that the to HBJ. So they were negotiating their own separate deal. And this is actually confirmed by HBJ himself in later communications with the appellants that we have our own deal with, sorry, excuse me, with the appellees. We have our own deal with Dr. Al-Kholi and Mr. Helawani, which you guys decided back in November, that's your business. These are completely separate agreements. At the very least, there were significant issues of fact in the record throughout all these communications. There was some evidence supporting, for example, that they accepted another fee, but there's plenty of countervailing evidence from the same time that they never intended this to override or waive their entitlement to a fee under the capital raise agreement from the appellees. I have one basic question, which is the complaint makes what I think is a mistake that we see a lot, which is it alleges an LLC's by its state of registration and principal place of business. But of course, the citizenship of an LLC is the citizenship of every single member, and it would destroy complete diversity if there were an alien among the LLC members. Is there anything in the record confirming the membership of defendant investment properties and confirming that none of its LLC members is an alien? To my understanding, the complaint alleges that Mr. Maklo is the primary principal, but I do not know if there's any evidence in the record of the domicile of any of the other members of Maklo Investment Properties. I don't believe the record reached that point, and summary judgment was decided in the midst of fact discovery, so there hadn't been depositions at that point, I believe. I think Judge Aitken's point is that that should have been confirmed before the complaint was filed, because otherwise all of this litigation would have been for naught if indeed there wasn't full diversity. I understand, Your Honor, and that is something I do not know from the record. Maybe Mr. Feuerstein will know, but thank you. You have some rebuttal time. We'll hear from the other side. May it please the Court. David Feuerstein, Feuerstein-Kulik, on behalf of the appellees. I'll start, Your Honors, with the last question posed to the appellants. Judge Castell actually put us to the task of submitting affidavits towards the end of the case prior to issuing his decision on summary judgment, confirming that the LLC's members were domestic members, and therefore there was a complete diversity such that he could rule. And forgive me, I don't know if it's in the record. I assume it is. It was towards the end of the case. I think with respect to the substantive case, you heard from my adversary that the fundamental agreement to which they cling is the November 6th email, which, as Judge Chin pointed out, said that I think a 2% fee will work. It doesn't indicate the obligor. It doesn't indicate what the fee is for, whether it's the entire amount of the capital, whether it's the debt, whether it's the equity. It doesn't say even the property with respect to that email. The subsequent emails, however, put meat to the bones, as you would say. It starts filling out what the actual agreement is for, and you see on December 11th, Mr. Kimmelman writes an email saying that we never finalized the deal. We need to finalize the compensation agreement. That's at 2-19 of the appendix. At 2-23, you see the December 14th email where Mr. Halawani says we're reviewing your counteroffer. As you may recall, that's where Mr. Kimmelman offered 1.5% on the capital that was being raised, not 2%. So already there's a change in the material terms that the appellants are discussing. Subsequent to that, on December 20th, you see the language that says, as a point of clarification, the deal fee will be capitalized within the deal, or it will be a deal cost. It's not just that the fee would be capitalized within the actual fundraise. It would actually be paid by the joint venture, and the subsequent LOIs that were being sent between the parties reflect that. If you look at 2-30 of the appendix, it says, in lieu of payment of the placement fee by the lower-tier joint venture, it's a non-managing member. In other words, that line indicates that the lower-tier joint venture, which was the joint venture that was being formed, would be paying the placement fee. And ultimately, I think, Judge Etkin, you noted there was a point in time where Halawani said, good enough. So if there was ever a meeting of the minds between the parties, it was in December, not in November, but in December, after it was clear that the obligor to pay was going to be the joint venture, not Harry Macklowe, not Macklowe Investment Properties. So unless the Court has further questions for me with respect to our position, I'm prepared to rest on our papers. When the payment was made, was a release procured? The releases that were procured on the $750,000 was the April 30, 2014 email, and that was what the parties had. And then there was a subsequent payment, as you may recall, Judge Jacobs, for $5 million, which was in November of 2014. And there's another release agreement that was executed. That release agreement was between a Delaware entity, but it included within it the, you know, the sort of general language that many people include, such as your principals or members. And of the principals of the 432 Delaware entity was MIP or Macklowe Investment Properties. So although MIP was never a signatory technically to any release agreement, it was encompassed in between the language of both the November 2014 release, and I would submit the April 30, 2014 email, which says we'll have no further right to any placement fee for the property. Thank you. We'll hear the rebuttal. Thank you. Just with respect to what has been characterized as the releases, the District Court never did find that these claims were released. It never ultimately reached that issue. And with respect to the emails, I would just like to re-emphasize those emails were not actually between the appellants and the appellees, or the appellants were not. I think, I believe they were forwarded the emails, but these were discussions that we would have no further fee. But there were releases. Were the terms fairly stated by your adversary? For the November... Releases, for the releases, the two. The November agreement was also an agreement that was between 432 Park Holdings, which was the Q-Invest entity. And people often, people usually get releases that are broader than just the individuals who are paying and receiving the money, because people don't want to be bothered with further litigation. They don't want to get sucked into it. They don't want to get claims over or anything else. So very often releases, as I'm sure you know, include as many people as you can, and entities that you can squeeze into them. And the question is, were the relevant entities here released? Well, that was before Judge Batts, even on the motion to dismiss as the November agreement was incorporated into the pleadings. And she found that it wasn't clear on the agreement that Mackle Investment Properties was, in fact, an intended third-party beneficiary, and that it was actually released because it was only named as an indirect participant in the Delaware entity. But otherwise, it wasn't referenced by name in any of the release clauses. So this is something that presents, at the very least, an issue of fact as the best evidence of whether there was a release is the agreement itself. And the district court found that this unequivocally released the claims such that they could be dismissed at that stage. But again, it's very clear that the agreements may have come to the attention of the appellees, but they were never actually signatories to the agreements. And any purported release clauses don't unequivocally name Mackle Investment Properties. And in fact, it's clear that they actually carve out Mr. Harry Mackle, and who was intended by that, whether that includes Mackle Investment Properties, is also an issue of fact. Thank you both. The court will reserve decision.